No. 24-3614

In the
United States Court of Appeals
for the Eighth Circuit

David A. McDougall, Individually and as Trustee for the Next-of-Kin of
Decedent Cynthia A. McDougall

*Appellee*

v.

CRC Industries, Inc.

*Appellant*

## PRINCIPAL BRIEF OF APPELLANT
## APPEAL FROM U.S. DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

ARTHUR, CHAPMAN, KETTERING,
SMETAK & PIKALA, P.A.

Beth A. Jenson Prouty (#0389275)
Jeffrey M. Markowitz (#391959)
81 South Ninth Street
500 Young Quinlan Building
Minneapolis, MN 55402
(612) 339-3500

FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP

Robert J. Gilbertson (#22361X)
David J. Wallace-Jackson (#288767)
Virginia R. McCalmont (#399496)
Capella Tower
225 South 6th Street, Suite 1500
Minneapolis, MN 55402
(612) 474-3300

Cynthia McDougall ("Ms. McDougall") died when a vehicle driven by Kyle Neumiller ("Neumiller") crashed into hers. Neumiller had intoxicated himself by misusing (huffing) CRC Duster while driving. CRC Duster is an aerosol dust remover, intended to remove dust from electronics and other products.

Appellee David McDougall ("McDougall") sued CRC Duster's manufacturer, appellant CRC Industries, Inc. ("CRC"). At trial, he claimed that CRC failed to adequately warn about dangers of huffing CRC Duster. The jury rejected this claim. McDougall also claimed that CRC Duster is unreasonably dangerous due to a design defect, i.e., a risk of a person deliberately huffing it. The jury agreed, even though he conceded that CRC Duster is "perfectly safe" when used as intended, offered no evidence of a safer alternative design, and did not call a product-safety expert. The court held CRC liable for the full $7.75 million award, even though the jury apportioned only 22.5% of the fault to CRC.

CRC requests 30 minutes for oral argument. Trial lasted two weeks. The design-defect verdict—without evidence of a safer alternative design—is unprecedented under Minnesota law. The judgment opened a Pandora's box that this Court kept shut in *Ashley County* (when applying Arkansas law). And the fault-damages issue is no less significant for Minnesota law. These issues require considerable attention, in addition to the other issues CRC raises.

## CORPORATE DISCLOSURE

CRC's parent company is Berwind Consolidated Holdings II, Inc., which is not publicly held. No publicly held corporation owns 10% or more of CRC stock.

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ......................... i

CORPORATE DISCLOSURE .................................................................................ii

TABLE OF CONTENTS ..................................................................................... iii

TABLE OF AUTHORITIES .................................................................................v

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES ............................................................................2

STATEMENT OF THE CASE ...............................................................................6

I.     **CRC Duster is a widely used aerosol dust remover that is—as McDougall conceded—"perfectly safe" when used as intended.** ......6

II.    **CRC Duster depends on a propellant (DFE) that, if deliberately huffed, intoxicates the huffer—like many other products.** .................7

III.   **CRC warned about the dangers of huffing on the CRC Duster label.** 8

IV.    **No alternative, feasible design would make CRC Duster safer—and McDougall conceded that he offered no evidence to the contrary.** .9

V.     **Neumiller huffed CRC Duster while driving; crashed into; and killed Ms. McDougall on July 22, 2019.** ...........................................................9

VI.    **The jury found that CRC adequately warned but that CRC Duster is unreasonably dangerous due to a design defect.** ...................................10

VII.   **The jury found CRC only 22.5% at fault, but the district court held CRC liable for the entire $7.75 million award, plus interest.** ...........11

SUMMARY OF ARGUMENT .............................................................................12

STANDARD OF REVIEW..................................................................................14

ARGUMENT ................................................................................................................ 15

I.     **<u>No Duty or Proximate Cause</u>: huffing CRC Duster while driving was not reasonably foreseeable and too remote from CRC Duster's design for CRC to have had a duty to prevent this misuse and for the product's design to have proximately caused Ms. McDougall's death.** ................................................................................................................ 15

II.    **<u>No Design Defect</u>: this is not the rare case in which a product is unreasonably dangerous due to a design defect even though no alternative, feasible design would make the product safer— especially given the lack of an expert's design-defect opinion.** ..... 30

III.   **<u>Misleading Instruction</u>: the alternative-design instruction misled the jury to believe that the absence of an alternative, feasible, safer design was essentially irrelevant, and thus requires a new trial.** 40

IV.   **<u>Several Liability</u>: The $7,750,000 liability judgment should be reduced to 22.5%, proportionate to the fault found by the jury** .... 44

     **A. CRC's codified right to the several-liability-fault limit does not depend on whether Neumiller intended to kill** ................................ 44

     **B. Neumiller's huffing while driving was, at most, reckless.** ............. 48

     **C. Alternatively, a new trial is warranted because of the evidence's insufficiency and the court's legal-effect answer to the jury.** ....... 50

V.    **<u>Pre-Verdict Interest</u>: The district court erroneously calculated pre-verdict interest based on $6,217,000 of the award, as McDougall did not prove that this sum was for anything other than future damages.** .................................................................................................................... 54

CONCLUSION ........................................................................................................... 57

CERTIFICATE OF COMPLIANCE ........................................................................... 59

CERTIFICATE OF SERVICE ..................................................................................... 60

# TABLE OF AUTHORITIES

## CASES

*Adams v. Toyota Motor Corp.*,
　867 F.3d 903 (8th Cir. 2017) ........................................................... 5, 33, 54

*ADT Sec. Servs., Inc. v. Swenson, ex rel. Est. of Lee*,
　687 F. Supp. 2d 884 (D. Minn. 2009) ................................................. 45, 46

*Am. Mod. Home Ins. Co. v. Thomas*,
　993 F.3d 1068 (8th Cir. 2021) .................................................................. 51

*Ashley Cnty., Ark. v. Pfizer, Inc.*,
　552 F.3d 659 (8th Cir. 2009) ................................................... 3, 15, 20, 23

*Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*,
　366 N.W.2d 271 (Minn. 1985) .................................................................. 37

*Bilotta v. Kelley Co.*,
　346 N.W.2d 616 (Minn. 1984) ............................................. 15, 30, 32, 38

*Boda v. Viant Crane Serv., LLC*,
　No. 19-CV-1437, 2021 WL 4444733 (D. Minn. Sept. 28, 2021) ................... 17

*Briscoe v. Amazing Prods., Inc.*,
　23 S.W.3d 228 (Ky. App. 2000) ................................................................ 20

*Canada ex rel. Landy v. McCarthy*,
　567 N.W.2d 496 (Minn. 1997) ............................................. 17, 18, 19, 26

*Cassidy v. Minihan*,
　794 F.2d 340 (8th Cir. 1986) ................................................................ 4, 49

*Chicago, R.I. & P. R. Co. v. Speth*,
　404 F.2d 291 (8th Cir. 1968) ................................................................ 4, 51

*Children's Broad. Corp. v. Walt Disney Co.*,
　357 F.3d 860 (8th Cir. 2004) .................................................................... 56

*City of Philadelphia v. Beretta U.S.A. Corp.*,
    277 F.3d 415 (3rd Cir. 2002) ....................................................................................... 20

*City of Richfield v. L. Enf't Lab. Servs.*,
    923 N.W.2d 36 (Minn. 2019) ....................................................................................... 16

*CRST Expedited, Inc. v. Swift Transportation Co. of Arizona, LLC*,
    8 F.4th 690 (8th Cir. 2021) ......................................................................................... 14

*DeLuna v. Mower Cnty.*,
    936 F.3d 711 (8th Cir. 2019) ....................................................................................... 18

*Dewitt v. Smith*,
    152 F.R.D. 162 (W.D. Ark. 1993) ................................................................................. 53

*Diehl v. 3M Co.*,
    2019 WL 4412976 (Minn. Ct. App. Sept. 16, 2019) ....................................... 2, 19

*Doe v. Bd. of Trustees of the Neb. State Colls.*,
    78 F.4th 419 (8th Cir. 2023) ....................................................................................... 14

*Domagala v. Rolland*,
    805 N.W.2d 14 (Minn. 2011) ....................................................................................... 16

*Durkee v. C.H. Robinson Worldwide, Inc.*,
    765 F. Supp. 2d 742 (W.D.N.C. 2011) ...................................................................... 22

*Duxbury v. Spex Feeds, Inc.*,
    681 N.W.2d 380 (Minn. App. 2004) .......................................................................... 33

*Est. of Doyle v. Sprint/Nextel Corp.*,
    2010 OK CIV APP 22, 248 P.3d 947 .......................................................................... 22

*Farmer's State Bank of Darwin v. Swisher*,
    631 N.W.2d 796 (Minn. 2001) .................................................................................... 46

*Farmers Ins. Exch. v. Vill. of Hewitt*,
    143 N.W.2d 230 (Minn. 1966) ........................................................................ 4, 46, 49

*Florenzano v. Olson*,
387 N.W.2d 168 (Minn. 1986) ...................................................................... 46

*Germann v. F.L. Smithe Mach. Co.*,
395 N.W.2d 922 (Minn. 1986) ...................................................................... 16

*Glay for McGill v. R.C. of St. Cloud, Inc.*,
2024 WL 2266939 (Minn. Ct. App. May 20, 2024) ........................................... 47

*Glay v. R.C. of St. Cloud, Inc.*,
No. 73-CV-21-129, 2023 WL 11864951 (Minn. Dist. Ct. Aug. 2, 2023) 3, 47

*Goetze v. Kroger, Co.*,
No. 1:18-cv-01701, 2020 WL 246407 (S.D. Ind. Jan. 15, 2020) .................... 21

*Great N. Ins. Co. v. Honeywell Int'l, Inc.*,
911 N.W.2d 510 (Minn. 2018) ...................................................................... 33

*Green Plains Otter Tail, LLC v. Pro-Env't, Inc.*,
953 F.3d 541 (8th Cir. 2020) ................................................................... 15, 17

*Grieco v. Daiho Sangyo, Inc.*,
344 So. 3d 11 (Fla. Dist. Ct. App. 2022) ............................................... 2, 3, 19

*Hagen v. State Bank of Cokato*,
1989 WL 12432 (Minn. Ct. App. Feb. 21, 1989) ........................................... 54

*Horton by Horton v. Orbeth, Inc.*,
342 N.W.2d 112 (Minn. 1984) ...................................................................... 46

*J & W Enters., Inc. v. Econ. Sales, Inc.*,
486 N.W.2d 179 (Minn. App. 1992) ............................................................. 24

*Johnson v. Kotval*,
369 N.W.2d 584 (Minn. App. 1985) .......................................................... 3, 18

*Kallio v. Ford Motor Co.*,
407 N.W.2d 92 (Minn. 1987) ................................................... 2, 31, 33, 40, 41

*Kapps v. Biosense Webster, Inc.*,
 813 F. Supp. 2d 1128 (D. Minn. 2011) ........................................................ 2, 32, 42

*KOKO Dev., LLC v. Phillips & Jordan, Inc.*,
 101 F.4th 544 (8th Cir. 2024) ..................................................................... 37

*Laubach v. Isaacson*,
 1992 WL 31367 (Minn. Ct. App. Feb. 25, 1992) ................................................. 18

*In re Levaquin Prods. Liab. Litig.*,
 700 F.3d 1161 (8th Cir. 2012) .................................................................... 14

*Lewellin on Behalf of Heirs of Lewellin v. Huber*,
 465 N.W.2d 62 (Minn. 1991) ...................................................................... 16

*Lienhard v. State*,
 431 N.W.2d 861 (Minn. 1988) ..................................................................... 54

*Lindholm v. BMW of N. Am., LLC*,
 862 F.3d 648 (8th Cir. 2017) ..................................................................... 24

*Lubbers v. Anderson*,
 539 N.W.2d 398 (Minn. 1995) ................................................................. 16, 17

*Magnuson v. Rupp Mfg., Inc.*,
 171 N.W.2d 201 (1969) ........................................................................... 24

*Markel v. Douglas Techs. Grp., Inc.*,
 No. 17-CV-1790, 2019 WL 1440423 (D. Minn. Apr. 1, 2019) ...................................2, 37

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*,
 401 F.3d 901 (8th Cir. 2005) ..................................................................... 54

*Meador v. Apple, Inc.*,
 911 F.3d 260 (5th Cir. 2018) ..................................................................... 22

*Meador v. Apple, Inc.*,
 No. 6:15-CV-715, 2016 WL 7665863 (E.D. Tex. Aug. 16, 2016) .................................. 22

*Medved v. Doolittle*,
   19 N.W.2d 788 (Minn. 1945) ........................................................................... 27

*Meier v. City of St. Louis*,
   78 F.4th 1052 (8th Cir. 2023) ........................................................................ 14

*Modisette v. Apple Inc.*,
   241 Cal. Rptr. 3d 209 (2018) ......................................................................... 22

*Montemayor v. Sebright Prods., Inc.*,
   898 N.W.2d 623 (Minn. 2017) ........................................................................ 33

*Montes v. Young Men's Christian Ass'n.*,
   297 Cal. Rptr. 3d 791 (Cal. App. Ct. 5th 2022) ....................................... 24

*Myers v. Hearth Techs., Inc.*,
   621 N.W.2d 787 (Minn. App. 2001) .............................................................. 56

*Parish v. Jumpking, Inc.*,
   719 N.W.2d 540 (Iowa 2006) ................................................................. 34, 35

*Piotrowski v. Southworth Prods. Corp.*,
   15 F.3d 748 (8th Cir. 1994) ............................................................................ 30

*Port Auth. of N.Y. and N.J. v. Arcadian Corp.*,
   189 F.3d 305 (3d Cir. 1999) ........................................................................... 20

*Ramstad v. Lear Siegler Diversified Holdings Corp.*,
   836 F. Supp. 1511 (D. Minn. 1993) ......................................................... 4, 53

*Reach Cos., LLC v. Newsert, LLC*,
   94 F.4th 712 (8th Cir. 2024) ..................................................................... 4, 40

*Reider v. Anoka-Hennepin Sch. Dist. No. 11*,
   728 N.W.2d 246 (Minn. 2007) ........................................................................ 47

*Richardson v. Holland*,
   741 S.W.2d 751 (Mo. Ct. App. 1987) ........................................................... 20

*Rosholt v. Blaw-Know Const. Equip. Corp.*, No. 04-CV-1181 (JMR/FLN), 2006
    WL 839505 (D. Minn. Mar. 29, 2006) ............................................................... 24, 38

*Schneider v. Chrysler Motors Corp.*,
    401 F.2d 549 (8th Cir. 1968) ...................................................................... 20

*Shardlow Townhomes Ass'n v. Midwest Fam. Mut. Ins. Co.*,
    988 N.W.2d 502 (Minn. App. 2023) ............................................................... 54

*Skifstrom v. City of Coon Rapids*,
    524 N.W.2d 294 (Minn. App. 1994) ............................................................... 56

*Staab [I] v. Diocese of St. Cloud*,
    813 N.W.2d 68 (Minn. 2012) ...................................................................... 44

*Staab [II] v. Diocese of St. Cloud*,
    853 N.W.2d 713 (Minn. 2014) .............................................................14, 44, 46

*State v. Brady*,
    70 N.W.2d 449 (Minn. 1955) ...................................................................4, 49

*Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC*,
    964 N.W.2d 613 (Minn. 2021) .................................................................... 17

*Stinson v. Clark Equip. Co.*,
    473 N.W.2d 333 (Minn. App. 1991) ............................................................... 54

*Strobel v. Chicago, R. I. & P. R. Co.*,
    96 N.W.2d 195 (Minn. 1959) ...................................................................... 27

*Suchy v. City of Geneva*,
    8 N.E.3d 565 (Ill. Ct. App. 2014) ............................................................ 24, 26

*Tandeski v. Barnard*,
    121 N.W.2d 708 (Minn. 1963) ..................................................................3, 27

*Trost v. Trek Bicycle Corp.*,
    162 F.3d 1004 (8th Cir. 1998) .................................................................... 30

*Victor v. Sell,*
    222 N.W.2d 337 (Minn. 1974) ................................................................. 48

*W. Sur. & Cas. v. Gen. Elec.,*
    433 N.W.2d 444 (Minn. App. 1988).......................................................... 37

*Wagner v. Hesston Corp.,*
    450 F.3d 756 (8th Cir. 2006) ......................................................... 2, 31, 40

*Walsh v. U.S. Bank, N.A.,*
    851 N.W.2d 598 (Minn. 2014) ................................................................. 19

*Walther v. Omaha Pub. Power Dist.,*
    412 F.2d 1164 (8th Cir. 1969) ............................................................4, 52

*Westbrock v. Marshalltown Mfg. Co.,*
    473 N.W.2d 352 (Minn. App. 1991).......................................................... 30

*Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.,*
    582 N.W.2d 916 (Minn. 1998) ....................................... 2, 16, 17, 20, 25

*Williams ex rel. Raymond v. Wal-Mart Stores E., L.P.,*
    99 So. 3d 112 (Miss. 2012) ..................................................................... 20

*Williams v. Cingular Wireless,*
    809 N.E.2d 473 (Ind. Ct. App. 2004)........................................................ 22

*Wurster v. Plastics Grp., Inc.,*
    917 F.3d 608 (8th Cir. 2019) ................................................................. 14

## FEDERAL STATUTES

28 U.S.C.
    § 1291................................................................................................. 1
    § 1332................................................................................................. 1

**STATE STATUTES**

Minnesota
    Minn. Stat. § 169A.20 ................................................................................................. 20
    Minn. Stat. § 549.09 ........................................................................................... 5, 13, 54
    Minn. Stat. § 604.01 ............................................................................... 3, 45, 46, 47, 48
    Minn. Stat. § 604.02 ................................................................... 3, 5, 13, 20, 44, 45, 46
    Minn. Stat. § 609.2122 ............................................................................................... 20

**FEDERAL RULES**

Fed. R. App. P.
    Rule 4 ............................................................................................................................. 1
    Rule 28 .......................................................................................................................... 59
    Rule 32 .......................................................................................................................... 59

Fed. R. Civ. P.
    Rule 49 .......................................................................................................................... 50
    Rule 50 ............................................................................................................................. 1
    Rule 59 ....................................................................................................................... 1, 14

**STATE RULES**

Minnesota Civil Procedure
    Rule 49.01 ..................................................................................................................... 52

## OTHER AUTHORITIES

Handguns and Products Liability, 97 Harv. L. Rev. 1912 (1984) .......................... 28

Restatement (Second) of Torts § 8A, cmt. b (1965)...................................................... 49

Restatement (Second) of Torts § 402A, cmt. j (1965)................................................. 24

Restatement (Second) of Torts § 500 (1965) .................................................................. 49

Ronald W. Eades, The Problem of Jury Instructions in Civil Cases, 27 Cumb. L. Rev. 1017 (1997) ....................................................................................................... 25

Schwartz, Foreword: Understanding Products Liability, 67 Cal. L. Rev. 435 (1979)............................................................................................................................ 31

# JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because McDougall is a Minnesota citizen (R.Doc. 1 at 3); CRC is a Pennsylvania citizen (R.Doc. 45 at 5-6); and the amount in controversy exceeds $75,000 (R.Doc. 45 at 7).

This Court has jurisdiction under 28 U.S.C. § 1291 because CRC timely appealed. Judgment was entered on June 11, 2024 (Add. 14, App. 80, R.Doc. 309 at 1) and amended three days later (Add. 15, App. 81, R.Doc. 310 at 1). Within 28 days of June 11, 2024, CRC filed post-trial motions for judgment as a matter of law ("JMOL"), a new trial, and amended judgment. R.Doc. 312; *see* Fed. R. Civ. P. 50(b), 59(b), 59(e). Doing so tolled the appeal deadline until the filing of the post-trial order on November 26, 2024. Add. 16, App. 82, R.Doc. 339 at 1; *see* Fed. R. App. P. 4(a)(4)(A). CRC timely appealed within 30 days. R.Doc. 341 at 1; Fed. R. App. P. 4(a)(1)(A), 4(a)(4)(A).

## STATEMENT OF THE ISSUES

1. **No Foreseeability; No Duty**: Could a reasonable jury have found that it was objectively reasonable to expect a person to deliberately misuse CRC Duster by huffing it while driving—sufficient to impose on CRC a duty to exercise care in its design of CRC Duster to avoid any risk of such misuse?

- *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916 (Minn. 1998); *Diehl v. 3M Co.*, No. A19-0354, 2019 WL 4412976 (Minn. Ct. App. Sept. 16, 2019) (nonprecedential) (Schellhas, J., dissent); *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. Dist. Ct. App. 2022).

2. **No Alternative-Design Evidence; No Expert Testimony**: Could a reasonable jury have found that CRC Duster is unreasonably dangerous due to a design defect even though appellee David McDougall offered no alternative-design evidence and no expert testimony on the standard of care or on how CRC Duster is unreasonably dangerous under Minnesota's balancing test?

- *Wagner v. Hesston Corp.*, 450 F.3d 756 (8th Cir. 2006); *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128 (D. Minn. 2011); *Kallio v. Ford Motor Co.*, 407 N.W.2d 92 (Minn. 1987); *Markel v. Douglas Techs. Grp., Inc.*, No. 17-CV-1790 (SRN/LIB), 2019 WL 1440423 (D. Minn. Apr. 1, 2019).

3. **No Causation**: Could a reasonable jury have found that any design defect proximately caused Cynthia McDougall's death and that Kyle Neumiller's huffing CRC Duster while driving was not a superseding cause?

- *Johnson v. Kotval*, 369 N.W.2d 584 (Minn. App. 1985); *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009); *Tandeski v. Barnard*, 121 N.W.2d 708 (Minn. 1963); *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. Dist. Ct. App. 2022).

4. **Several Liability**: Does the jury's finding that Neumiller engaged in an intentional tort make CRC liable for all damages, even though (1) the jury apportioned only 22.5% fault to CRC; (2) CRC is severally liable only for damages "in proportion" to its fault under Minn. Stat. § 604.02; and (3) Neumiller's product "misuse" is "fault" under Minn. Stat. § 604.01?

- Minn. Stat. § 604.02, subd. 1; *Glay v. R.C. of St. Cloud, Inc.*, No. A23-1464, 2024 WL 2266939 (Minn. Ct. App. May 20, 2024) (nonprecedential) (Slieter, J., dissenting), *review granted* (Minn. Sept. 17, 2024).

5. **Neumiller's Mental State**: Even if Neumiller's mental state matters to CRC's liability, could a reasonable jury have found that the death that Neumiller caused by driving while intoxicated is an intentional tort, even though the law treats driving while intoxicated (from alcohol) as no more than reckless?

- *Cassidy v. Minihan*, 794 F.2d 340 (8th Cir. 1986); *State v. Brady*, 70 N.W.2d 449 (Minn. 1955); *Farmers Ins. Exch. v. Vill. of Hewitt*, 143 N.W.2d 230 (Minn. 1966).

6.    **Alternative-Design Instruction**: Is a new trial required because the alternative-design instruction told the jury that the lack of alternative-design evidence is essentially irrelevant, contrary to Minnesota law under *Kallio*?

- *Reach Cos., LLC v. Newsert, LLC*, 94 F.4th 712 (8th Cir. 2024).

7.    **Legal-Effect Answer**: Is a new trial required by the district court's answer to the juror question on whether the jury's apportionment of fault would impact damages—when (1) the answer road-mapped how the jury could make CRC liable for all damages, (2) the answer rested on a legal error, and (3) the court acknowledged that giving the answer was a bit "risky"?

- *Chicago, R.I. & P. R. Co. v. Speth*, 404 F.2d 291 (8th Cir. 1968); *Walther v. Omaha Pub. Power Dist.*, 412 F.2d 1164 (8th Cir. 1969); *Ramstad v. Lear Siegler Diversified Holdings Corp.*, 836 F. Supp. 1511 (D. Minn. 1993).

8.    **Pre-Verdict Interest**: Does pre-verdict interest accrue on $6,217,000 of the award, even though (1) pre-verdict interest does not accrue on future damages; (2) David McDougall offered evidence of only $391,000 in

past damages—which are not part of the $6,217,000; and (3) the only damages that McDougall requested other than the $391,000 are future damages?

- Minn. Stat. § 549.09, subd. 1(b)(2); *Adams v. Toyota Motor Corp.*, 867 F.3d 903 (8th Cir. 2017).

<u>**STATEMENT OF THE CASE**</u>

**I.  CRC Duster is a widely used aerosol dust remover that is—as McDougall conceded—"perfectly safe" when used as intended.**

CRC Duster is an aerosol-spray dust remover (*i.e.*, a "duster"). Tr.[1] 593-97. The intended purpose of dusters is to remove dust from a variety of electronics and other products. App. 225, Pl. Ex. 431[2] at MCDOUGALL005483. Dusters are widely sold and have been on the market for decades. Tr. 601, 708-709, 734. CRC is one of 22 manufacturers, which, collectively, sell roughly 20 million dusters per year. Tr. 709-11; App. 226, Pl. Ex. 2 at MCDOUGALL005158.

---

[1] Unless otherwise indicated, all citations to "Tr." are to the trial transcript.

[2] No admitted trial exhibits (cited herein as "Pl. Ex." and "Def. Ex.") are available on the electronic docket. CRC previously transmitted copies of the admitted documentary exhibits and admitted video exhibit to the Eighth Circuit on a thumb drive (along with three physical admitted exhibits). This Court docketed its receipt of the thumb drive and the physical exhibits on February 14, 2025.

The following trial exhibits, cited herein, are in CRC's appendix:

- Pl. Ex. 168 (Admitted at Tr. 1233) - App. 128-133
- Pl. Ex. 169 (Admitted at Tr. 1329) - App. 134-148
- Def. Ex. 2 (Admitted at Tr. 550, 684) - App. 149
- Pl. Ex. 400 (Admitted at Tr. 277) - App. 150-168
- Pl. Ex. 272 (Admitted at Tr. 809)- App. 169-171
- Excerpt from Pl. Ex. 431 (Admitted at Tr. 389-90) - App. 172-194
- Excerpt from Pl. Ex. 2 (Admitted at Tr. 268) - App. 195-232

Pl. Ex. 1191 (Admitted at Tr. 607-608) is cited herein but is not in CRC's appendix because it is a video.

CRC has sold roughly 10 million cans over roughly 20 years, which equals less than five percent of the duster market. Tr. 708-10. CRC did not sell CRC Duster directly to consumers. It sold to retailers and distributors, which sold to consumers. Tr. 599, 665.

At trial, McDougall's counsel conceded to the jury that CRC Duster is "perfectly safe when you use it as intended." Tr. 125.

## II.    CRC Duster depends on a propellant (DFE) that, if deliberately huffed, intoxicates the huffer—like many other products.

Dusters depend on a liquified gas to generate the needed pressure to effectively flush dirt away. Tr. 735-36, 1432. According to the U.S. Consumer Product Safety Commission ("CPSC"), the most common duster propellant is 1,1 Difluoroethane ("DFE"). App. 224-225, Pl. Ex. 2 at MCDOUGALL005156-5157. CRC Duster, like most dusters, contains 100 percent DFE. Tr. 268-69; App. 199, Pl. Ex. 2 at MCDOUGALL005131. Huffing a duster involves deliberating spraying the contents into one's mouth or nose or inhaling the fumes from a cloth or bag. Tr. 601-02; App. 181, Pl. Ex. 431 at MCDOUGALL005366. Huffing can immediately intoxicate. Tr. 265, 268-69. Effects may include euphoria, loss

of inhibitions, giddiness, deliriousness, visual disturbances, nausea, vomiting, light-headedness, sleepiness, and unconsciousness. Tr. 263-64.

Even if dusters could not be abused, many other household products can be, including felt-tip markers, glue, gasoline, and other aerosol sprays. App. 185, Pl. Ex. 431 at MCDOUGALL005370. Ant and roach sprays, for example, are roughly 89.65 percent DFE. App. 187, Pl. Ex. 431 at MCDOUGALL005372.

## III. CRC warned about the dangers of huffing on the CRC Duster label.

CRC Duster's label warns: "**WARNING:** Vapor Harmful. Contains 1,1 Difluoroethane" and "Overexposure can cause drowsiness, unconsciousness, respiratory depression and death." App. 149, Def. Ex. 2 at CRC_056566. CRC Duster's label emphasizes:

> Deliberate misuse by concentrating and inhaling the contents is illegal and can be harmful or fatal. Inhalation abuse can cause death.

*Id*. CRC's human-factors expert, Dr. Joseph Sala, opined that the warnings on CRC Duster were "reasonable, adequate and appropriate" and addressing

huffing while driving would not have enhanced the warnings. Tr. 1531, 1540-42.

## IV. No alternative, feasible design would make CRC Duster safer—and McDougall conceded that he offered no evidence to the contrary.

McDougall's counsel conceded to the district court that he did "not present[] evidence of alternative feasible design." Tr. 1410. He opted not to call his product-safety expert to testify. Tr. 20-21.

CRC's product-safety expert, Dr. Delmar Morrison, testified without rebuttal that "[t]here is no evidence that alternative safer designs exist or that they would prevent intentional abuse of the product or that they would prevent the accident" (Tr. 1423)—which was consistent with other evidence.[3]

## V. Neumiller huffed CRC Duster while driving; crashed into; and killed Ms. McDougall on July 22, 2019.

On July 22, 2019, Neumiller bought a can of CRC Duster from a hardware store. Tr. 1307, 1311-14. Ms. McDougall died when Neumiller crashed his vehicle into hers on a highway. Tr. 1124, 1130-31. Neumiller had huffed CRC

---

[3] *See, e.g.,* Tr. 1016 (CRC considered replacing DFE with propane but chose not to because propane was "more dangerous"); Tr. 763-64 (a different propellant "meet[s] the definition of PFAS," i.e., "forever chemicals" that cause pollution); App. 176, Pl. Ex. 431 at MCDOUGALL005361 (CPSC staff recommending against adding bitterants due to "lack of efficacy").

Duster while driving. Add. 9, App. 75, R.Doc. 272 at 2.[4] He was charged with and pleaded guilty to negligent-criminal-vehicular homicide. App. 128-129, Pl. Ex. 168 at 1-2; App. 140-46, Pl. Ex. 169 at Crim. Hear. Tr. 7-13; *see* Tr. 1328-31.

## VI. The jury found that CRC adequately warned but that CRC Duster is unreasonably dangerous due to a design defect.

At trial, McDougall argued failure-to-warn and design-defect theories. He argued that CRC Duster was unreasonably dangerous due to a design defect because of a risk of huffing and CRC did not pull the product from the market before the crash. Tr. 1742-43 ("You either come up with steps that will deter [huffing]; and if you can't, you don't sell it.").

The jury found no failure to warn "for the safe use or reasonably foreseeable misuse of the product." Add. 9, App. 75, R.Doc. 272 at 2. But it found that CRC Duster was "in a defective condition, unreasonably dangerous to users of or those exposed to the product, because of [CRC's] design" and that this defect was "a direct cause" of the damages. Add. 8, App. 74, R.Doc. 272 at 1.

In a bifurcated trial phase, the jury found no basis for punitive damages.[5] Add. 12, App. 78, R.Doc. 273 at 1. It included a note, stating, in part: "we expect

---

[4] CRC disputed that view at trial but does not contest this jury finding on appeal.

[5] The magistrate judge had denied McDougall's motion to claim punitive damages. R.Doc. 88 at 1. McDougall did not appeal to the district court by the

CRC to use this as an opportunity to be a leader in their industry and spearhead an effort to address inhalant abuse." Add. 13, App. 79, R.Doc. 273-1 at 1.

**VII.  The jury found CRC only 22.5% at fault, but the district court held CRC liable for the entire $7.75 million award, plus interest.**

The jury found $7,750,000 in damages. Add. 11, App. 77, R.Doc. 272 at 4. It apportioned only 22.5% fault to CRC, apportioning 77.5% to Neumiller. Add. 10, App. 76, R.Doc. 272 at 3. It also found that Neumiller huffed while driving with intent to kill, i.e., with substantial certainty that he would kill. Add. 10, App. 76, R.Doc. 272 at 3. The district court concluded that, because his tort was intentional, CRC was liable for all of the damages. Add. 3, App. 46, R.Doc. 229 at 3; Add. 15, App. 81, R.Doc. 310 at 1.

CRC had moved for JMOL pre-verdict. R.Docs. 241-42. The district court denied that motion. Tr. 1622. It also denied CRC's post-trial motions for JMOL, a new trial, and amended judgment. Add. 58-59, App. 124-25, R.Doc. 339 at 43-44. And it granted McDougall's motion to amend the judgment to add prejudgment interest, adding $2,525,523.29 (pre-verdict) and $135,130.169 (post-verdict), making the total judgment $10,410,653.46. Add. 60, App. 126, R.Doc. 340 at 1.

---

14-day deadline or otherwise. Minn. L.R. 72.2(a)(1). But more than a year later, the court let him add this claim near the end of trial. Tr. 1407-08.

## SUMMARY OF ARGUMENT

The denial of JMOL should be reversed. Ms. McDougall did not die because of how CRC designed CRC Duster. She died because Neumiller recklessly and criminally misused CRC Duster by huffing it while driving. He did so contrary to the product's warning label, which the jury found adequately warned as to "reasonably foreseeable misuse." He also did so, in the jury's view, with intent to kill, *i.e.*, substantially certain that he would kill. CRC contends that he was no more than reckless. Regardless—whether viewing the issue through the lens of the foreseeability needed for a duty to exist, the reasonable-care test that governs design-defect law, or proximate cause—Neumiller alone is responsible for the consequences of his driving while intoxicated. That is especially so given the Minnesota Court of Appeals' determination in *Johnson* that the wholesale sale of alcohol was too remote from a plaintiff's injury caused by a drunk driver. Making a duster—a product *not* intended to intoxicate—is even more remote.

Alternatively, the denial of a new trial should be reversed. The verdict is so contrary to the evidence as to indicate that the jury failed to consider all the evidence or operated under a mistake. And the court essentially instructed that the lack of alternative-design evidence was irrelevant, when Minnesota law says that only in a "rare" case can a design-defect plaintiff prevail without it.

Were this Court not to reverse generally, CRC asks it to modify the judgment in two ways. First, the $7.75 million award should be reduced to 22.5%, i.e., $1,743,750, because the jury found CRC to be only 22.5% at fault and no joint-and-several-liability exception applies. *See* Minn. Stat. § 604.02, subd. 1. Second, the district court erroneously concluded that pre-verdict interest accrued on $6,217,000 of the award. Pre-verdict interest does not accrue on future damages. Minn. Stat. § 549.09, subd. 1(b)(2). Either this amount is the future "losses to be suffered" damages McDougall requested *or* it is impossible to tell; either way, interest on this amount is barred under *Toyota*.

## STANDARD OF REVIEW

This Court reviews the denial of JMOL de novo, viewing the facts in the light most favorable to the verdict. *CRST Expedited, Inc. v. Swift Transportation Co. of Arizona, LLC*, 8 F.4th 690, 697 (8th Cir. 2021). The Court gives the prevailing party the benefit of all "reasonable inferences." *Wurster v. Plastics Grp., Inc.*, 917 F.3d 608, 617 (8th Cir. 2019). It may "consider uncontradicted and unimpeached evidence in the record favoring the moving party." *Doe v. Bd. of Trustees of the Neb. State Colls.*, 78 F.4th 419, 423 (8th Cir. 2023).

This Court reviews the denial of a new trial for clear abuse of discretion. *In re Levaquin Prods. Liab. Litig.*, 700 F.3d 1161, 1166 (8th Cir. 2012). A new trial should be granted when the verdict is "so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence, or acted under some mistake." *Id.* (quotation omitted). That standard "is less rigorous than the standard for granting JMOL." *Id.* (quotation omitted).

This Court reviews orders on post-trial motions to amend under Fed. R. Civ. P. 59(e) for an abuse of discretion. *Meier v. City of St. Louis*, 78 F.4th 1052, 1059 (8th Cir. 2023). But statutory interpretation is a legal determination reviewed de novo. *Staab [II] v. Diocese of St. Cloud*, 853 N.W.2d 713, 716 (Minn. 2014). "If the Legislature's intent is clear from the unambiguous language of the statute, we apply the statute according to its plain meaning." *Id.* at 716-17.

**ARGUMENT**

**I.**     <u>**No Duty or Proximate Cause**</u>**: huffing CRC Duster while driving was not reasonably foreseeable and too remote from CRC Duster's design for CRC to have had a duty to prevent this misuse and for the product's design to have proximately caused Ms. McDougall's death.**

"Minnesota law governs this diversity action." *Green Plains Otter Tail, LLC v. Pro-Env't, Inc.*, 953 F.3d 541, 545 (8th Cir. 2020). "Under Minnesota law, a products liability claim for defective design requires: (1) the product was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed when it left the manufacturer's control; and (3) the defect was the proximate cause of the injury sustained." *Id.* at 545-46 (citing *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984)). The duty to design safe products requires exercising care in design to avoid any "unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use." *Bilotta*, 346 N.W.2d at 621 (quotation omitted).

Whether a duty and proximate cause exist turn on overlapping considerations of foreseeability, remoteness, and public policy. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 670 (8th Cir. 2009) (noting that a "link" exists between duty and proximate cause "because both depend on an analysis of foreseeability" (quotation omitted)). Foreseeability is a legal issue that should

be "decided by the court" except in "close cases." *Domagala v. Rolland*, 805 N.W.2d 14, 27 (Minn. 2011) (quotation omitted). The Minnesota Supreme Court has said that proximate cause presents a legal issue only "where reasonable minds can arrive at only one conclusion" and is "[g]enerally . . . a question of fact for the jury." *Lubbers v. Anderson*, 539 N.W.2d 398, 402 (Minn. 1995). But it has also said that proximate cause "is not a matter of causation, it is one of policy," which courts "have always used . . . to implement public policy in establishing the parameters of liability." *Lewellin on Behalf of Heirs of Lewellin v. Huber*, 465 N.W.2d 62, 65 (Minn. 1991) (quotation omitted). Similarly, as to duty, "[i]f the connection is too remote to impose liability as a matter of public policy, . . . there is no duty, and consequently no liability." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986). Public-policy issues are "for the courts." *City of Richfield v. L. Enf't Lab. Servs.*, 923 N.W.2d 36, 41 (Minn. 2019).

**Duty:** A manufacturer's duty to protect is limited to protecting persons who "might be injured by [a product's] use or misuse" from "foreseeable dangers" of the product. *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918-19 (Minn. 1998). A danger is foreseeable only if the "specific danger" was "objectively reasonable to expect" and not simply "within the realm of any conceivable possibility." *Id.* at 918. For example, in *Whiteford*, a child was injured when he collided with a stationary snowmobile while

tobogganing. 582 N.W.2d at 917. The Minnesota Supreme Court reinstated summary judgment for the snowmobile manufacturer, holding that the danger of crashing into the snowmobile was "too remote to impose a duty." *Id.* at 919.

**Proximate Cause:** A defendant's act proximately causes an injury only if the act was "a substantial factor in bringing about the injury" and the injury was a "foreseeable result." *Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 620 (Minn. 2021) (quotation omitted) (citing *Lubbers*, 539 N.W.2d at 401). The substantial-factor element requires the injury to have "'follow[ed] in an unbroken sequence, without an intervening efficient cause, from the original [defect].'" *Boda v. Viant Crane Serv., LLC*, No. 19-CV-1437 (HB), 2021 WL 4444733, at *12 (D. Minn. Sept. 28, 2021) (quoting *Green Plains*, 953 F.3d at 547 (citing *Dellwo v. Pearson*, 107 N.W.2d 859, 861 (Minn. 1961)), *aff'd,* 42 F.4th 935 (8th Cir. 2022). Merely "set[ting] the stage for an accident," *i.e.*, "but for" causation, is not enough. *Lubbers*, 539 N.W.2d at 402 (quotations omitted). The foreseeability element requires that the defendant's act be one which the defendant "ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others," not that the defendant "could . . . have foreseen the particular results." *Dellwo*, 107 N.W.2d at 861-62 (quotation omitted). Also, for an intervening efficient cause to break the causal chain, the intervening cause must "not [have been] 'reasonably foreseeable by the original

wrongdoer.'" *DeLuna v. Mower Cnty.*, 936 F.3d 711, 717 (8th Cir. 2019) (quoting *Canada ex rel. Landy v. McCarthy*, 567 N.W.2d 496, 507 (Minn. 1997)).[6]

Under Minnesota law, wholesale sale of alcohol is too remote from a person's injury in a motor-vehicle accident caused by a drunk driver who consumed the alcohol, when a third-party dispensed it, for the wholesaler to be liable to the injured person. *Johnson v. Kotval*, 369 N.W.2d 584, 584-86 (Minn. App. 1985) (reversing jury verdict because the "wholesale sale . . . is too far removed from the resultant injury to constitute proximate cause"). Given that the wholesale sale of alcohol (a product *intended* to intoxicate) that made the drunk driver intoxicated was too remote from the plaintiff's injury in *Johnson*, so too must CRC's sale of CRC Duster (a product *not* intended to intoxicate) to a hardware store be too remote from Ms. McDougall's death caused by Neumiller's huffing CRC Duster while driving. *Cf. Laubach v. Isaacson*, No. C0-91-1984, 1992 WL 31367, at *1-*2 (Minn. Ct. App. Feb. 25, 1992) (nonprecedential) (holding that burn injuries caused by pouring gasoline antifreeze onto a skateboard and lighting it on fire were "'too remote to impose

_____

[6] This Court stated in *DeLuna* that, under *Dellwo*, "foreseeability is *not* part of the proximate-cause analysis in Minnesota." *DeLuna*, 936 F.3d at 717 (citing *Dellwo*, 107 N.W.2d at 861). The court in *Dellwo* did reaffirm the rule that "foreseeability is not the test of proximate cause." 107 N.W.2d at 859. But the court's analysis indicates that it meant only to disclaim the foreseeability of the "particular results" as being the test. *Id.* at 862 (quotation omitted).

liability'" on the antifreeze manufacturer "'as a matter of public policy,'" noting that the misuse was "intentional and obviously dangerous" (quoting *Germann*, 395 N.W.2d at 924)), *review denied* (Minn. Apr. 29, 1992).

Judge Schellhas concluded similarly in her *Diehl* dissent: "[t]he link between the danger (being struck by a vehicle on the sidewalk) and 3M's alleged conduct (manufacturing a household dust-removal product) is simply too attenuated and remote to support the existence of a duty." *Diehl v. 3M Co.*, No. A19-0354, 2019 WL 4412976, at *5 (Minn. Ct. App. Sept. 16, 2019) (nonprecedential) (Schellhas, J., dissenting).[7] The Florida Court of Appeals held similarly in *Grieco*, holding that neither a duty nor proximate cause existed:

> Even though the risk of a driver simultaneously abusing a dust-removal product and consequently striking either a vehicle or person off a roadway is within the boundless realm of conceivable possibilities, it was not objectively reasonable for [the huffing driver]'s criminal conduct to be foreseeable as a matter of law to establish either duty or proximate cause in the context of this product liability action.

*Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 27 (Fla. Dist. Ct. App. 2022).

---

[7] The majority had reversed dismissal on other grounds, holding (in a nonprecedential opinion) that plaintiff adequately pleaded the foreseeability of *huffing*, but it did not address the foreseeability of huffing *while driving*, and it reversed and remanded for the district court to "complete the analysis" of whether a duty existed. *Id.* at *4. The pleading standard that it applied is more liberal than the federal *Twombly-Iqbal* pleading standard and does not require plausibility. *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 600 (Minn. 2014).

That conclusion is consistent with a principle that this Court and the Minnesota Supreme Court have recognized, "'A manufacturer is not an insurer and cannot be held to a standard of duty of guarding against all possible types of accidents and injuries.'" *Whiteford*, 582 N.W.2d at 919 (quoting *Schneider v. Chrysler Motors Corp.*, 401 F.2d 549, 557 (8th Cir. 1968)). It is also consistent with a trend of courts concluding that manufacturers have no "duty to prevent a criminal[8] misuse of the product which is entirely foreign" to the product's intended purpose. *See* Unintended use of product, Am. L. Prod. Liab. 3d § 42:16. Examples include this Court's holding in *Ashley County* that manufacturing cold medicine—which third parties "cook[ed]" into methamphetamine—did not proximately cause damages suffered to counties from the methamphetamine epidemic. 552 F.3d at 670-72. Examples also include cases involving turning fertilizer into a bomb used on a building,[9] attacking someone with drain cleaner,[10] gun violence,[11] and driving and crashing while impaired by

[8] Driving while deliberately intoxicated from any substance is a crime, Minn. Stat. § 169A.20, subd. 1(3), and is negligent criminal vehicular homicide when it kills someone, Minn. Stat. § 609.2122, subd. 1(a)(5).

[9] *Port Auth. of N.Y. and N.J. v. Arcadian Corp.*, 189 F.3d 305, 313 (3d Cir. 1999).
[10] *Briscoe v. Amazing Prods., Inc.*, 23 S.W.3d 228, 230 (Ky. App. 2000).

[11] *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 425 (3rd Cir. 2002); *Richardson v. Holland*, 741 S.W.2d 751, 756-57 (Mo. Ct. App. 1987); *Williams ex rel. Raymond v. Wal-Mart Stores E., L.P.*, 99 So. 3d 112, 120 (Miss. 2012).

medicine.[12]

The district court, in concluding that a reasonable jury could have found foreseeability, found that CRC was aware of people huffing CRC Duster to get high while driving. Add. 29-35, App. 95-101, R.Doc. 339 at 14-20. No such evidence exists. The court found that evidence showed that CRC "was aware of ACE's blog with a collection of reports of inhalant abuse, including driving-while-huffing dust remover cases." Add. 27, App. 93, R.Doc. 339 at 12. But all that the evidence showed on this issue was that a CRC executive (Michelle Rudnick) was "aware that [the blog] existed," had seen "some of the articles," and "didn't research it extensively." Tr. 742-43. No evidence indicates that she saw any articles on huffing while driving. McDougall's epidemiology expert testified that the blog included at least 1,340 news articles, only 375 of which (roughly 28 percent) involved car crashes related to dusters. Tr. 907-08. It took that expert 32 hours to download and analyze the 1,340 news reports to ascertain that 375-article figure. Tr. 907, 924.[13] Imputing knowledge of the 375

---

[12] *Goetze v. Kroger, Co.*, No. 1:18-cv-01701, 2020 WL 246407, at *3-5 (S.D. Ind. Jan. 15, 2020).

[13] The expert also opined that 2,316 people died related to DFE (not just dusters) between 2006 and 2022. Tr. 914-16. No evidence shows that CRC knew of any of that before 2019, apart from one 2013 incident in which a person died from huffing CRC Duster. App. 169-171, Pl. Ex. 272 at CRC_046116-

articles to Rudnick that it took the expert 32 hours to ascertain would be unreasonable and speculative.

Regardless, knowledge of huffing while driving makes such criminal misuse no more than possible. The cell-phone cases and *Ashley County* are instructive. As Apple has acknowledged, "'[t]exting while driving has become a major concern.'" *Modisette v. Apple Inc.*, 241 Cal. Rptr. 3d 209, 217 (2018). But the judicial consensus is that cellphone manufacturers are not liable for motor-vehicle injuries caused by misuse of cellphones while driving. They recognize that the design of phones simply makes misusing them while driving "possible." *Id.* at 219.[14] Relatedly, in *Ashley County*, this Court held that manufacturing cold medicine did not proximately cause methamphetamine-epidemic damages to counties, "even if the manufacturers knew that cooks purchased their products

---

CRC_046118. Moreover, the expert spent 40 hours compiling this data for trial—using computer code that he wrote for this purpose—from 17 years of CPSC data. Tr. 925-27.

[14] *See also Williams v. Cingular Wireless*, 809 N.E.2d 473, 479 (Ind. Ct. App. 2004) ("[I]t is not foreseeable that the sale of a phone to a customer will necessarily result in a car accident."), *followed in Est. of Doyle v. Sprint/Nextel Corp.*, 2010 OK CIV APP 22, ¶ 16, 248 P.3d 947, 951, *and Durkee v. C.H. Robinson Worldwide, Inc.*, 765 F. Supp. 2d 742, 759-60 (W.D.N.C. 2011), *aff'd sub nom. Durkee v. Geologic Sols., Inc.*, 502 F. App'x 326 (4th Cir. 2013); *accord Meador v. Apple, Inc.*, No. 6:15-CV-715, 2016 WL 7665863, at *4 (E.D. Tex. Aug. 16, 2016) (no-proximate-cause holding), *report and rec. adopted,* No. 615CV00715RWSKNM, 2017 WL 3529577 (E.D. Tex. Aug. 17, 2017), *aff'd, Meador v. Apple, Inc.*, 911 F.3d 260, 267 (5th Cir. 2018).

to use in manufacturing methamphetamine." 552 F.3d at 670. This Court was

as much concerned about that case as it was about the cases that could follow:

> And what of the liability of manufacturers in other industries that, if stretched far enough, can be linked to other societal problems? Proximate cause seems an appropriate avenue for limiting liability in this context, as in the gun manufacturer context, particularly where an effect may be a proliferation of lawsuits not merely against these defendants but against other types of commercial enterprises—manufacturers, say, of liquor, anti-depressants, SUVs, or violent video games—in order to address a myriad of societal problems regardless of the distance between the causes of the problems and their alleged consequences.

*Id.* at 671-72 (quotation omitted).

The district court cited "CRC's answer to an interrogatory that a person's

misuse of CRC Duster to get high creates risks." Add. 29, App. 95, R.Doc. 339 at

14. But CRC was simply explaining the basis for its open-and-obvious defense:

> A person who abuses the Duster product by inhaling it creates the risk that he will get high, lose consciousness, or even die. A person who drives after getting high creates the risk that he will be unable to control his vehicle and could cause damage and hurt or kill himself or others.

App. 165, Pl. Ex. 400 at 16. The risk's obviousness *refutes* any notion that huffing

while driving was foreseeable.[15] That is especially true given the jury's finding that CRC adequately warned "for the safe use or reasonably foreseeable misuse of the product." Add. 9, App. 75, R.Doc. 272 at 2.[16] "Where warning is given, *the seller may reasonably assume that it will be read and heeded*; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *J & W Enters., Inc. v. Econ. Sales, Inc.*, 486 N.W.2d 179, 181 (Minn. App. 1992) (emphasis added by court) (quoting Restatement (Second) of Torts § 402A, cmt. j (1965)); *accord Magnuson v. Rupp Mfg., Inc.*, 171 N.W.2d 201, 206 (Minn. 1969). Illustrating the point, in *Lindholm*, this Court concluded that a decedent's misuse of a jack "was not foreseeable as a matter of law, given the warnings that accompanied it." *Lindholm v. BMW of N. Am., LLC*, 862 F.3d 648, 652 (8th Cir. 2017). And in *Rosholt*, the federal court, applying Minnesota law, granted summary judgment because the warnings "satisfied" the manufacturer's "duty to design a reasonably safe product." *Rosholt v. Blaw-Know Const. Equip. Corp.*, No. 04-CV-1181 (JMR/FLN), 2006 WL 839505, at *3-*4 (D. Minn. Mar. 29, 2006).

---

[15] *See Montes v. Young Men's Christian Ass'n.*, 297 Cal. Rptr. 3d 791, 796 (Cal. App. Ct. 5th 2022) ("[I]t was not foreseeable that he would knowingly embrace an entirely obvious risk by voluntarily encountering the danger." (quotations omitted)); *see also Suchy v. City of Geneva*, 8 N.E.3d 565, 579 (Ill. Ct. App. 2014).

[16] *Supra also*, Facts, §III.

At trial, McDougall argued that "their testimony" established reasonable foreseeability (Tr. 1767), apparently referring to Adam Selisker, a recently retired CRC executive. No reasonable juror could have agreed. Selisker agreed that CRC knew before the crash that "*if* someone huffed while driving, they *could* lose control of their vehicle and kill themselves or possibly someone else." Tr. 604 (emphasis added). When counsel for McDougall pressed—"So that's something CRC could reasonably foresee, correct?"— Selisker replied, "Yes." *Id.*; *see also id.*, Tr. 617-18. "'Reasonable foreseeability' is extremely broad, open-ended," and carries a "nuanced meaning developed through heavy usage by legal professionals." Richard L. Cupp, Jr., *Proximate Cause, the Proposed Basic Principles Restatement, and Products Liability*, 53 S.C. L. Rev. 1085, 1089, 1102 n.22 (2002); *accord* Ronald W. Eades, *The Problem of Jury Instructions in Civil Cases*, 27 Cumb. L. Rev. 1017, 1023 (1997). By this term, the law means "objectively reasonable to expect," not conceivably possible. *Whiteford*, 582 N.W.2d at 918. Selisker was not speaking as a lawyer.  He spoke as a lay person about what CRC could conceive of possibly happening (using words like "if" and "could"). He was not aware of any crashes prior to the 2019 crash in which a driver allegedly huffed while driving. Tr. 668-70.

And even if CRC Duster were unreasonably dangerous due to a design defect due to the intoxicating effects of its propellant when deliberately huffed

(it is not), Neumiller's choice to huff while driving is an intervening efficient cause that broke any causal chain under the four elements. Elements 1 and 3 are, in the district court's words, "obvious and already proven." Tr. 1686.[17] The "harmful effects must have occurred after the [alleged] original negligence" and "it must have actively worked to bring about a result which would not otherwise have followed from the original negligence." *Canada*, 567 N.W.2d at 507. And the court itself concluded, "it is clear that Neumiller's actions 'actively worked to bring about a result which would not otherwise have followed'" from any alleged product defect. App. 17, R.Doc. 145 at 17.

Nor could the jury have reasonably found that CRC Duster's design "brought about" Neumiller's huffing while driving (Element 2) or that Neumiller's huffing while driving was "reasonably foreseeable" to CRC (Element 4). *See Canada*, 567 N.W.2d at 507. Huffing while driving was not objectively reasonable to expect for the reasons argued above. Nor did CRC Duster's design bring about Neumiller's conscious choice to huff while driving. "[A]n independent act is considered an intervening, superseding cause, excusing any prior negligence, if an actor who had the time and the ability to make a conscious choice makes a choice that leads to a result which would not

_____

[17] That is why the court did not submit those two elements to the jury. *Id.*

have occurred except for that conscious choice." *Tandeski v. Barnard*, 121 N.W.2d 708, 713 (Minn. 1963). Examples include a driver choosing to stop a vehicle in the wrong lane, causing a collision, *id.* at 710, 713, and a driver knowing that a collision with a stationary truck was about to occur and doing nothing to avoid it, evincing "extreme, reckless, and wanton disregard" for the lives of others and acting "well-nigh suicidal," *Medved v. Doolittle*, 19 N.W.2d 788, 791-92 (Minn. 1945).[18] The jury found that Neumiller, in huffing while driving, was so aware of the risk that he was taking that he was substantially certain that his huffing while driving would kill someone. Add. 9-10, App. 75-76, R.Doc. 272 at 2-3. CRC disputes that finding, contending that Neumiller was no more than reckless. *Infra* Arg. §IV.B. Regardless, Neumiller's conscious, unforced choice broke any causal chain and thus defeats proximate cause.

In concluding that the jury could have reasonably found otherwise, the court referenced, without elaboration, (1) "CRC's knowledge of the huffing misuse," (2) "CRC's use and subsequent removal of the bitterant," (3) "CRC's de minimus steps to deter misuse," (4) "warning label changes on CRC Duster," and (5) "expert reports." Add. 34-35, App. 100-101, R.Doc. 339 at 19-20. None of this reasonably supports finding that Neumiller was not an intervening cause:

---

[18] *Overruled in part on other grounds by Strobel v. Chicago, R. I. & P. R. Co.*, 96 N.W.2d 195 (Minn. 1959).

- As to (1), no evidence was offered that CRC knew of anyone huffing while driving before the crash.

- As to (2), CRC removed the bitterant because it was ineffective to deter misuse and had other problems, Tr. 612-616, a view with which the CPSC agrees, App. 176, Pl. Ex. 431 at MCDOUGALL005361 ("Staff recommends . . . that no bitterant should be required for use in aerosol duster products, given the lack of efficacy of bitterants.").

- As to (3), CRC contributed $15,000 to the Alliance for Consumer Education. Tr. 635-636. Regardless, "[w]hen a product is intentionally and illegally misused, . . . there is little a manufacturer can do to prevent injury." Handguns and Products Liability, 97 Harv. L. Rev. 1912, 1928 (1984).

- As to (4), it is unclear to what warning-label changes the court was referring. Also, the jury found no failure to warn (Add. 9, App. 75, R.Doc. 272 at 2), and no alternative warning would have prevented the crash (*supra*, Facts, §III).

- As to (5), no expert report was admitted at trial.

Because no reasonable jury could have found that huffing while driving was foreseeable before the 2019 crash or that any alleged design defect in CRC Duster proximately caused Ms. McDougall's death, CRC respectfully asks the Court to reverse the denial of JMOL. Alternatively, because the verdict is so

contrary to the evidence, CRC requests reversal of the denial of a new trial.

**II.** **No Design Defect: this is not the rare case in which a product is unreasonably dangerous due to a design defect even though no alternative, feasible design would make the product safer— especially given the lack of an expert's design-defect opinion.**

Under Minnesota law, "a negligence standard" governs whether a product is unreasonably dangerous due to a design defect, even if the theory is strict liability. *Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. App. 1991); *accord Piotrowski v. Southworth Prods. Corp.*, 15 F.3d 748, 751 (8th Cir. 1994). Whether the manufacturer exercised reasonable care in choosing a design turns on **"**a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Bilotta*, 346 N.W.2d at 621 (quotation omitted). "The test is an objective standard 'which focuses on the conduct of the manufacturer in evaluating whether its choice of design struck an acceptable balance among several competing factors.'" *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1009 (8th Cir. 1998) (quoting *Bilotta,* 346 N.W.2d at 622).

McDougall did not offer evidence that Minnesota law typically requires for a design-defect claim: an alternative, feasible, safer design. *See* Tr. 1410 (conceding he did "not present[] evidence of alternative feasible design"); Tr. 1087 ("We will not be arguing alternative feasible design."). As this Court explained in *Wagner*, discussing *Kallio*:

Wagner's assertion that Minnesota substantive law does not require proof of an alternative feasible design in a products-liability case is a bit misleading. Minnesota requires a plaintiff in a products-liability case to prove that the product was defective and was unreasonably dangerous. *Kallio v. Ford Motor Co.,* 407 N.W.2d 92, 96 (Minn. 1987). To satisfy the second requirement, "the plaintiff ordinarily has the burden of showing the existence of an alternative design that was safer." *Id.* Indeed, the Minnesota Supreme Court has ruled that "[t]o establish a prima facie case that [a product] was unreasonably dangerous normally requires production of evidence of the existence of a feasible, alternative safer design." *Id.* While the Minnesota Supreme Court did not go so far as to require proof of an alternative feasible design in all defective-products cases, the Court noted that it could only conceive of "rare cases" in which "the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned." *Id.* at 97 & n.8.

*Wagner v. Hesston Corp.*, 450 F.3d 756, 760 (8th Cir. 2006). Also, no Minnesota design-defect plaintiff has prevailed before without identifying an alternative, feasible, safer design. *See, e.g., Kallio*, 407 N.W.2d at 96 n.6 (collecting cases). And that makes sense. "'[O]ne simply cannot talk meaningfully about a risk-benefit defect in a product design until and unless one has identified some design alternative . . . that can serve as the basis for a risk-benefit analysis.'" Proof of a reasonable alternative design, 1 Owen & Davis on Prod. Liab. § 8:10 (4th ed.) (quoting Schwartz, Foreword: Understanding Products Liability, 67 Cal. L. Rev. 435, 468 (1979)).

In a radical departure from established Minnesota law, the district court erred by concluding that McDougall could prevail *without* alternative-design evidence *and without* satisfying the rare-case exception. Add. 33-34, App. 99-100, R.Doc. 339 at 18-19. No court has previously recognized such a third option. Such recognition is in tension with *Wagner*, which recognized only the two paths. It is contrary to Judge Schiltz's ruling that "the plaintiff must explain why, under the reasonable-care balancing test, the world would be a better place if the product were either designed differently or taken off the market." *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1161 (D. Minn. 2011). And it is logically impossible. The reasonable-care test faults a manufacturer that fails to take "the burden of the precaution which would be effective to avoid the harm" when the likelihood and gravity of the harm is sufficiently high. *Bilotta*, 346 N.W.2d at 621 (quotation omitted). That test requires the plaintiff to identify what "precaution" the manufacturer unreasonably failed to take. An alternative design is one precaution. When none exists, the only alternative precaution would be not to sell the product. The extremeness of the latter is likely why the Minnesota Supreme Court said it would require a "rare case[]."

So the question is this: when no alternative feasible design would have made the product safer, when does the likelihood and gravity of harm risked make the product unreasonably dangerous and thus require the manufacturer

to remove it from the market? The Minnesota Supreme Court has not addressed that question, apart from saying that such a product could "[c]onceivably" exist. *Kallio*, 407 N.W.2d at 97 n.8. CRC respectfully suggests that this Court should predict that the Minnesota Supreme Court would follow the approach of the Restatement (Third) of Torts: Product Liability (1998) in analyzing whether a product is unreasonably dangerous due to a design defect in the absence of an alternative, feasible, safer design. *See generally Adams v. Toyota Motor Corp.*, 867 F.3d 903, 919 (8th Cir. 2017) (law governing such predictions), *as corrected* (Aug. 14, 2017). Minnesota courts have frequently followed the Restatement since its post-*Kallio* publication in 1998.[19] That trend includes a recent precedential opinion that relied on the design-defect section of the Restatement, Restatement (Third) of Torts: Prod. Liab. § 2(b). *SECURA Ins. Co. v. Deere & Co.*, 12 N.W.3d 103, 108 (Minn. App. 2024), *review denied* (Minn. Dec. 17, 2024). And the Reporters considered *Kallio*, among other cases, when articulating the standard for when a too-dangerous-for-market product might exist. Restatement (Third) of Torts: Prod. Liab. § 2(b), Rep. Note, cmt. b.

The Reporters began with the *Kallio-Wagner-Kapps* premise that, "In

---

[19] *See, e.g., Great N. Ins. Co. v. Honeywell Int'l, Inc.*, 911 N.W.2d 510, 520 (Minn. 2018); *Montemayor v. Sebright Prods., Inc.*, 898 N.W.2d 623, 631 n.4 (Minn. 2017); *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 387 (Minn. App. 2004).

judging a product under risk-utility guidelines there are only two options. Either the product should have been reasonably designed to avoid the risk of foreseeable injury or the product should not have been marketed at all." Restatement (Third) of Torts: Prod. Liab. § 2, cmt. b. They concluded that, even if a plaintiff claimed that a product was "so dangerous that it should not have been marketed at all," a plaintiff would still need to identify "a reasonable alternative design." Restatement (Third) of Torts: Prod. Liab. § 2, cmt. d. They reasoned that, for "[c]ommon and widely distributed products such as alcoholic beverages, firearms, and above-ground swimming pools," courts recognize that "legislatures and administrative agencies can, more appropriately than courts, consider the desirability of commercial distribution of some categories of widely used and consumed, but nevertheless dangerous, products." *Id.*; *see, e.g.*, *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 545 (Iowa 2006) (trampolines). Were the Minnesota Supreme Court to take that approach, JMOL would be required, as dusters are widely used consumer products. *Supra*, Facts, §I.[20]

Even if the Minnesota Supreme Court did not adopt that hard-and-fast

---

[20] Indeed, the matter is under CPSC review (which has the power to ban products, Tr. 751-52). Two years after the crash, it began looking into duster abuse. App. 199, Pl. Ex. 2 at MCDOUGALL005131. As of trial, it was engaged in a rulemaking process (Tr. 578, 683, 786; App. 200, Pl. Ex. 2 at MCDOUGALL005132)—in which CRC participated (Tr. 745-46, 786).

rule, the Reporters' standard is instructive. They recognized that cases (like *Kallio*, which they cited) periodically qualify statements about a reasonable alternative design not always being required with "a footnote stating that in some cases a product may be judged not reasonably safe because it should be removed from the market rather than be redesigned." Restatement (Third) of Torts: Prod. Liab. § 2, cmt. b. So they left open the possibility for courts to adopt a manifestly-unreasonable exception: that "a product is manifestly unreasonable because the extremely high degree of danger posed by its use or consumption outweighs its negligible social utility" and thus should be removed from the market. *Id.*, cmt. b. They envisioned that the product would be so bad that "no rational, reasonable person, fully aware of the relevant facts, would choose to use, or to allow children to use, the product." *Id.* cmt. e.[21] They hypothesized that a novelty cigar—that exploded when lit, by design—could be such a product. Restatement (Third) of Torts: Prod. Liab. § 2, cmt. e, Ill. 5.

As a matter of law, CRC Duster is not that product. Unlike the exploding cigar, which is unreasonably dangerous when used for its intended purpose,

---

[21] In the words of one Reporter, the product would need to be the "'rare, probably non-existent,' product that "'was so bad, so very outloud bad, so very antisocial, that it would tug against the very grain of the way you were raised.'" *Parish*, 719 N.W.2d at 544 (quoting *The Habush Amendment,*—Fall Kan. J.L. & Pub. Pol'y 86, 86 (1998)).

CRC Duster is, as McDougall conceded, "perfectly safe when you use it as intended." Tr. 125. Even if huffing while driving is foreseeable misuse, the jury found that CRC adequately warned against it. Add. 9, App. 75, R.Doc. 272 at 2. Nor could the product's utility fairly be characterized as negligible. Although the CPSC considered alternative propellants in dust-removal products, it rejected them due to "diminished consumer utility." App. 209, Pl. Ex. 2 at MCDOUGALL005141. Consumers have also long valued dusters' utility; 20 million cans of duster are sold annually. *Supra*, Facts, §I. The likelihood of harm from duster misuse pales in comparison. McDougall's epidemiology expert identified 375 involving car crashes related to dusters, and 2,316 persons who died related to DFE (not just dusters) over 17 years: 2006 and 2022. Tr. 907-08, 914-16. These are *tragedies*. But as the CPSC has recognized, "inhalant abusers will continue their behavior, even if aerosol duster products become unavailable." App. 176, Pl. Ex. 431 at MCDOUGALL005361. Dusters are also "less frequently" abused than other products, like "nitrous oxide, amyl nitrite, and felt-tip pens/markers." App. 179, Pl. Ex. 431 at MCDOUGALL005364. No reasonable jury could find that such a product is so manifestly dangerous that a manufacturer must recall it.

Even if such a product could theoretically satisfy the rare-case exception, a lay jury could not reach that conclusion without an expert opinion about how

CRC Duster is unreasonably dangerous due to a design defect under the reasonable-care balancing test. "[A] products liability case usually will fail without an expert's proof of defect by expert testimony." Proof of defect—Expert testimony, 1 Owen & Davis on Prod. Liab. § 6:5 (4th ed.). A design-defect plaintiff must offer expert testimony "[w]hen the standard of care that a manufacturer must exercise in weighing the costs and benefits of an alleged design defect is not within the general knowledge and experience of lay people." *Markel v. Douglas Techs. Grp., Inc.*, No. 17-CV-1790 (SRN/LIB), 2019 WL 1440423, at *3 (D. Minn. Apr. 1, 2019) (quotation omitted), *aff'd,* 968 F.3d 888 (8th Cir. 2020); *accord Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985). The expert must "explain[] *why* the 'defects' constituted an 'unreasonably dangerous condition' under Minnesota's reasonable-care balancing test." *Markel*, 2019 WL 1440423, at *3 (emphasis in original) (quoting *W. Sur. & Cas. v. Gen. Elec.*, 433 N.W.2d 444, 448 (Minn. App. 1988)).

"This court reviews the necessity of expert testimony for a clear abuse of discretion." *KOKO Dev., LLC v. Phillips & Jordan, Inc.*, 101 F.4th 544, 549 (8th Cir. 2024). In concluding that McDougall did not need to offer a design-defect expert opinion,[22] the district court dismissed the complexity of the issue at hand as

---

[22] McDougall declined to call his product-safety expert to testify. *See* April 11, 2024 Pre-Trial Motion In Limine Hearing Transcript, R.Doc. 290 at Tr. 20-21.

simply a matter of "weigh[ing] the dangers of misusing DFE with its utility in a product to remove dust from electronics." Add. 31, App. 97, R.Doc. 339 at 16. But it neglected the requirement of *fault* baked into the reasonable-care balancing test. The test faults only the manufacturer who fails to take on "the burden of the precaution which would be effective to avoid the harm" when the harm is sufficiently likely and grave. *Bilotta*, 346 N.W.2d at 621; *see* Comparison with other liability theories—Strict liability vs. negligence, 1 Owen & Davis on Prod. Liab. § 5:29 (4th ed.). CRC Duster is not the sort of manifestly-dangerous product that the Restatement Reporters envisioned, nor so manifestly dangerous that an unassisted jury could find that it is. Even if it were possible for McDougall to have proved otherwise, doing so would have required him to offer an expert's opinion that, under Minnesota's reasonable-care balancing test, CRC was required to pull CRC Duster from the market before the crash.

Although the district court pointed to a case that says that products-liability cases do not always require expert testimony, even there, expert testimony was required. *Holverson v. ThyssenKrupp Elevator Corp.*, No. 12-CV-2765 (ADM/FLN), 2014 WL 3573630, at *4 (D. Minn. July 18, 2014); *see* Add. 31, App. 97, R.Doc. 339 at 16. It noted that McDougall called three liability experts: a toxicologist, an addiction-medicine doctor, and an academic who studies the epidemiology of inhalant abuse. Add. 32, App. 98, R.Doc. 339 at 17.

But none opined on how CRC Duster is unreasonably dangerous due to a design defect—nor would any of these experts have been qualified to offer such an opinion. The court referenced the toxicologist's testimony that some paints and oils use DFE and contain substances that makes them harder to abuse than dusters. Add. 32, App. 98, R.Doc. 339 at 17 (citing Tr. 269-271). But the toxicologist did not suggest that a duster could be designed like paint or oil.

At trial, McDougall argued that CRC conceded the defect issue when Selisker—after viewing a person huffing a different duster, becoming extremely intoxicated, and passing out (Pl. Ex. 1191)—testified, "Nothing justifies what I just saw" (Tr. 610; *see* Tr. 1743:2-3). But that was simply a shorthand for what Selisker had just said, "I stand by the product. . . . [I]t has a social benefit[.] . . . Nothing justifies someone doing an illegal act . . . but our product on the market when used as intended does not justify an illegal act." Tr. 609; *see also* Tr. 680.

Reversal of the denial of JMOL is thus warranted because no reasonable jury could have found that CRC Duster is unreasonably dangerous due to a design defect without evidence of an alternative, safer design. No reasonable jury could have found that CRC Duster is so manifestly dangerous that CRC acted unreasonably in not pulling the product from the market before the crash.

**III.** __Misleading Instruction__**: the alternative-design instruction misled the jury to believe that the absence of an alternative, feasible, safer design was essentially irrelevant, and thus requires a new trial.**

This Court reviews jury-instruction determinations for abuse of discretion. *Reach Cos., LLC v. Newsert, LLC*, 94 F.4th 712, 716 (8th Cir. 2024). "[A] new trial is necessary only when the errors misled the jury or had a probable effect on a jury's verdict." *Id.* (quotation omitted). Both happened.

The district court instructed the jury, "A plaintiff is not required to provide proof of an alternative feasible design." App. 59, R.Doc. 274 at 20. It erred by not qualifying that instruction with, as CRC requested: "if the plaintiff proves in the alternative that the product is so unreasonably dangerous that it must be removed from the market" or "only in the rare case where the product should be taken off the market." Tr. 1084-88, 1642-45.

In *Wagner*, this Court concluded that an appellant's "assertion that Minnesota substantive law does not require proof of an alternative feasible design in a products-liability case is a bit misleading." 450 F.3d at 760. That is because of what the Minnesota Supreme Court said in *Kallio* about an alternative, feasible, safer design "'ordinarily'" being required, and the court envisioning only "'rare'" cases in which a plaintiff might prevail without it. *Id.* (quoting *Kallio*, 407 N.W.2d at 96-97 & n.8.). The instruction here was similarly misleading, as it lacked words communicating those qualifiers.

In *Kallio*, the Minnesota Supreme Court concluded that a district court did not err by not instructing a jury that the plaintiff needed to prove an alternative, safer design. 407 N.W.2d at 96-97. But there, "[t]he tenor, if not the literal wording, of the instructions permitted the jury to consider availability of, and failure to use, an alternative, safer design as a factor." *Id.* at 96. Those instructions told the jury that it could consider "the 'state of the art' and the 'practices of the automotive industry.'" *Id.* The instructions given here told the jury that it could consider "[t]he cost and ease of taking effective precautions to avoid [the] harm," "[w]hether the manufacturer considered the knowledge and technology in the field," App. 59, R.Doc. 274 at 20, ##6-7; and "industry standard" and "what is usually done or customary in this industry to decide whether reasonable care was used," App. 233, R.Doc. 274 at 39, Instruction No. 29. But when read in light of "[a] plaintiff is not required to provide proof of an alternative feasible design," App. 59, R.Doc. 274 at 20, the tenor of the given instructions is that the lack of an alternative, feasible, safer design is essentially irrelevant—contrary to *Kallio*, under which "[s]uch evidence *is* relevant to, and certainly may be an important factor in, the determination of whether the product was unreasonably defective." 407 N.W.2d at 97 (emphasis added).

The district court concluded that its instruction was appropriate because proving that the manufacturer should have adopted an alternative design or

pulled the product from the market are not the only options. Add. 37, App. 103, R.Doc. 339 at 22. It was mistaken, under *Kallio*, *Wagner*, and *Kapps*, and its view is contrary to logic and the view of the Restatement Reporters. *Supra*, Arg. §II.

This error also very likely affected the verdict. The jury heard extensive, uncontradicted expert and lay evidence that no alternative, feasible, safer design exists. *Supra*, Facts, §IV. But instead of being told, at least in tenor, that the lack of such an alternative design is a factor to be weighed when assessing whether CRC Duster is defective, the jury was instructed overtly that the plaintiff need not offer such evidence. Moreover, McDougall amplified the prejudice by making this instruction the "Number 1" thing that he wanted to "make clear" during closing arguments. Tr. 1764-65. He urged, "[I]f someone starts to say in that [deliberations] room, hey, why didn't they come up with a better design? They're not telling us how they could do it better. You have to look at that person and remind them that's not the law. You will see it in the JIG. You will see it." *Id.* It is thus likely that the jury disregarded the relevant, important evidence that no alternative, feasible design would have made CRC Duster safer—because the court and McDougall said the jury could.

The jury was essentially told that it could find CRC Duster to be unreasonably dangerous due to a design defect "in the abstract," *see Kapps*, 813 F. Supp. 2d at 1161, without considering the significance of the lack of an

alternative, feasible, safer design or whether the product was so dangerous that CRC had a duty to recall it. McDougall advanced that latter theory. But the instructions told the jury what the district court thought the instructions told the jury: it could find CRC Duster to be unreasonably dangerous due to a design defect even if the jury did not agree with McDougall's argued theory.

A new trial before a properly instructed jury is thus warranted.

**IV.** **Several Liability**: The $7,750,000 liability judgment should be reduced to 22.5%, proportionate to the fault found by the jury.

The district court ruled on this issue both in a pre-verdict order (Add. 1-5, App. 44-48, R.Doc. 229 at 1-5) and an order denying CRC's post-trial motions, which denied CRC's renewed motion for JMOL on the issue of Neumiller's intent being no more than reckless and alternative motions for amended judgment and a new trial (Add. 42-45, App. 108-111, R.Doc. 339 at 27-30).

**A.** **CRC's codified right to the several-liability-fault limit does not depend on whether Neumiller intended to kill.**

"A severally liable party is responsible for only his or her equitable share of a damages award . . . ." *Staab II*, 853 N.W.2d at 718 (quotation omitted). When no joint-liability exception applies, a tortfeasor is no more than severally liable for the damages that are "in proportion" to that person's fault. Minn. Stat. § 604.02, subd. 1. The 2003 amendments "clearly indicate the Legislature's intent to limit joint and several liability to the four circumstances enumerated in the exception clause, and to apply the rule of several liability in all other circumstances." *Staab [I] v. Diocese of St. Cloud*, 813 N.W.2d 68, 78 (Minn. 2012). Courts cannot "effectively create a fifth exception." *Staab II*, 853 N.W.2d at 719.

The reasons for reversal are thus straightforward. The jury apportioned only 22.5% of the fault to CRC. Add. 10, App. 76, R.Doc. 272 at 3. No one suggests that any codified joint-liability exception applies to CRC. *See* Minn. Stat.

§ 604.02, subd. 1 (fault over 50%, involvement in a common scheme or plan that results in injury, intentional tort, certain environmental-statute liability). Therefore, the judgment should be reduced to 22.5%, i.e., $1,743,750.

But the district court concluded that, "if the jury finds that Neumiller is an intentional tortfeasor, the Court will not permit CRC to limit its exposure to liability to the extent of its fault." Add. 3, App. 46, R.Doc. 229 at 3; *accord* Add. 42-45, App. 108-11, R.Doc. 339 at 27-30. It reasoned: "Minnesota courts have previously declined to apply the comparative fault statute, Minn. Stat. § 604.01, to intentional tortfeasors." Add. 2, App. 45, R.Doc. 229 at 2. And it followed *ADT*, where it predicted that Minnesota courts would hold that a negligent tortfeasor is jointly and severally liable when it breached a duty to protect the plaintiff from an intentional tortfeasor. *ADT Sec. Servs., Inc. v. Swenson, ex rel. Est. of Lee*, 687 F. Supp. 2d 884, 895 (D. Minn. 2009).

Every step of that analysis is legal error. Importing the intentional-tort exception from the section 604.01 comparative-fault context into the section 604.02 several-liability context to deprive a severally-liable-only party of 604.02's protection is contrary to law and the policy animating the exception.

The intentional-tort exception is an exception to the comparative-fault rules in Minn. Stat. § 604.01, subd. 1. Those rules bar or reduce a plaintiff's recovery based on the plaintiff's fault in two ways: "(a) [] the plaintiff cannot

recover from one whose degree of fault is less than the plaintiff's, and (b) [] the damages shall be reduced only in proportion to the plaintiff's fault." *Horton by Horton v. Orbeth, Inc.*, 342 N.W.2d 112, 115 (Minn. 1984). But those rules do not apply when the tortfeasor's tort was intentional, i.e., the intentional-tort exception. *Florenzano v. Olson*, 387 N.W.2d 168, 172 n.1, 175 (Minn. 1986). That exception reflects "the unwillingness of the courts to aid one who is guilty of an intentional wrong." *Farmers Ins. Exch. v. Vill. of Hewitt*, 143 N.W.2d 230, 239 (Minn. 1966); *accord Florenzano*, 387 N.W.2d at 176 n.7. And it is consistent with the statutory rules because the statute's definition of "fault" does not list intentional torts. *See* Minn. Stat. § 604.01, subd. 1a; *ADT*, 687 F. Supp. 2d at 895; *Farmer's State Bank of Darwin v. Swisher*, 631 N.W.2d 796, 801 (Minn. 2001).

Unlike section 604.01, section 604.02 expressly mentions intentional tortfeasors. It shows that the Minnesota Legislature decided that, when "a person . . . commits an intentional tort," only *that* tortfeasor is "jointly and severally liable for the whole award." Minn. Stat. § 604.02, subd. 1(3). Concluding that a concurrently liable non-intentional tortfeasor is *also* liable for the entire award would impermissibly override that legislative judgment by inventing a "fifth" joint-and-several-liability ground. *See Staab II*, 853 N.W.2d at 719. Moreover, the only other judges to have addressed this issue—the *Glay* judges (Minnesota Court of Appeals dissent and Minnesota state court judge)—

are in accord: "section 604.02 specifically permits the comparison of fault between negligent and intentional tortfeasors." *Glay, trustee for McGill v. R.C. of St. Cloud, Inc.*, No. A23-1464, 2024 WL 2266939, at *7 (Minn. Ct. App. May 20, 2024) (nonprecedential) (Slieter, J., dissenting), *review granted* (Minn. Sept. 17, 2024);[23] *see Glay v. R.C. of St. Cloud, Inc.*, No. 73-CV-21-129, 2023 WL 11864951, at *6 (Minn. Dist. Ct. Aug. 2, 2023) (emphasizing § 604.02, subd. 1(3)).

Moreover, even if the absence of intentional torts from section 604.01's definition of fault matters, Neumiller has fault under it because he engaged in "misuse of a product," Minn. Stat. § 604.01, subd. 1a, as the jury found. Add. 10, App. 75, R.Doc. 272 at 2. The district court concluded that the fault definition covered only misuse that is negligent or reckless because sentence 1 states: "'Fault' includes acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others . . . ." Minn. Stat. § 604.01, subd. 1a; *see* Add. 45, App. 111, R.Doc. 339 at 30. But courts "cannot add" words to statutes. *Reider v. Anoka-Hennepin Sch. Dist. No. 11*, 728 N.W.2d 246, 250 (Minn. 2007). "[M]isuse of a product" is listed in sentence 2, as something that

---

[23] The *Glay* majority did not reach this issue. The Minnesota Supreme Court accepted review of the issue. Oral argument is scheduled for March 11, 2025.

fault "also includes." Minn. Stat. § 604.01, subd. 1a. Sentence 2 does not say "negligent or reckless misuse." Only by adding words could the court be right.

Moreover, the jury specifically found that Neumiller was "at fault" for Ms. McDougall's death, Add. 10, App. 76, R.Doc. 272 at 2, operating under an instruction that defined fault as product misuse, negligence, recklessness, and sale of an unreasonably dangerous defective product. App. 64, R.Doc. 274 at 25. It apparently found product-misuse fault.

Because CRC is no more than severally liable and was found to be 22.5% at fault, CRC should only be liable for 22.5% of the award. The $7,750,000 liability judgment should thus be reduced to $1,743,750.

**B. Neumiller's huffing while driving was, at most, reckless.**

This Court, however, need not wade into that question of Minnesota law. It matters only if Neumiller engaged in an intentional tort. He did not because his huffing while driving was no more than reckless. No reasonable jury could have found, as the jury found that, when he huffed while driving, he had intent to kill, *i.e.*, was "substantially certain" that doing so would "result in the consequences/the death of another person." Add. 10, App. 76, R.Doc. 272 at 3.

Under Minnesota law, an actor intends the consequences of his act when he "'desires to cause consequences of his act, or [] he believes that the consequences are substantially certain to result from it.'" *Victor v. Sell*, 222

N.W.2d 337, 340 n.4 (Minn. 1974) (quoting Restatement (Second) of Torts § 8A, cmt. b). The state of mind required for substantial-certainty intent requires more than recklessness, Restatement (Second) of Torts § 8A, cmt. b, which requires a person to act in deliberate disregard or indifference for "facts which create a high degree of risk of physical harm to another" of which he knows or has reason to know. Reckless—Defined, 4 Minn. Prac., Jury Instr. Guides--Civil CIVJIG 25.37 (6th ed.) (quoting Restatement (Second) of Torts § 500).

No reasonable jury could have found that Neumiller's huffing while driving was more than reckless. Driving while intoxicated from alcohol is an instructive analogue. In *Cassidy*, this Court concluded that the driving while intoxicated from alcohol at issue was, "at most, reckless." *Cassidy v. Minihan*, 794 F.2d 340, 344 (8th Cir. 1986). Under Minnesota law, driving while intoxicated from alcohol reflects culpable negligence, *State v. Brady*, 70 N.W.2d 449, 453 (Minn. 1955), which is "not the type of intentional act that will bar contributory negligence as a defense," *Hewitt*, 143 N.W.2d at 238.

The district court concluded that the jury could have found that Neumiller acted with substantial certainty that a death would result from his conduct based on circumstantial evidence—but it did not identify what that evidence is. Add. 4, App. 47, R.Doc. 229 at 4; Add. 45, App. 111, R.Doc. 339 at 30. The evidence presented at trial does not support its conclusion. Neumiller

testified that, although he knew that there was a "possibility" that huffing while driving could kill someone, he did not intend to hurt himself or others. Tr. 1310, 1315-16, 1324-26. Once before the accident, he had passed out and driven into a neighbor's yard, which law enforcement believed was due to huffing. Tr. 1162. But there is nothing in the trial record that could have led a reasonable jury to find that, when he huffed while driving on the day of the crash, he did anything more (than the already serious misconduct of) recklessly disregarding facts that created a high degree of risk of physical harm to another, of which he knew or had reason to know. Notably, the State of Minnesota charged him with *negligence* crimes, and he pleaded guilty to a *negligence* crime. App. 128-129, Pl. Ex. 168 at 1-2; App. 140-41, Pl. Ex. 169 at Crim. Hearing Tr. 7-8. Even *McDougall* called Neumiller's conduct *negligence* when suing him. Tr. 1303-04.

Because the denial of JMOL on the Neumiller-intent finding should be reversed, the $7,750,000 liability judgment should be reduced to $1,743,750.

### C. Alternatively, a new trial is warranted because of the evidence's insufficiency and the court's legal-effect answer to the jury.

The jury instructions and explanations must "enable the jury to make its findings on each submitted issue." Fed. R. Civ. P. 49(a)(2). "[A] jury in making special findings is best directed not to concern themselves about whether their answers will be favorable to one party or the other or what the final result of

the law suit [*sic*] may be." *Chicago, R.I. & P. R. Co. v. Speth*, 404 F.2d 291, 295 (8th Cir. 1968). "Answers to [juror] requests must be within the specific limits of the question presented and accurate, clear, neutral, and non-prejudicial." *Am. Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1074 (8th Cir. 2021) (quotation omitted). This Court reviews such answers for an abuse of discretion. *Id*.

Question 4 on the verdict form asked the jury to apportion fault between CRC and Neumiller. Add. 10, App. 76, R.Doc. 272 at 3. During deliberations, a juror asked, "Will the percentages we provide in question 4 affect the damages awarded? (If we decide to award damages)." App. 72, R.Doc. 277 at 1 (Juror Question 2); *see* Tr. 1824-1831 (arguments on the issue). The court answered, "If you answer 'Yes' to both questions under Count 1 and/or both questions under Count 2, and answer 'Yes' to Questions 3A and 3B, then any damages awarded would not be divided and Plaintiff would receive all the damages." App. 73, R.Doc. 277 at 1.

That answer requires a new trial for four reasons—in addition to the evidence being insufficient to support the intent finding also requiring a new trial, even if the Court declines to reverse the denial of JMOL on that issue.

*First*, the answer was not accurate. CRC is no more than severally liable for damages proportionate to its fault, regardless of Neumiller's mental state. *Supra*, Arg. §IV.A. The court reasoned that giving the answer was consistent

with its practice and Minnesota state court general practice. Add. 41, App. 107, R.Doc. 339 at 25-26. But it recognized that its view on the intentional-tort issue was not settled law. It believed that the issue posed a "conundrum" (Add. 3, App. 46, R.Doc. 229 at 3), which made the answer "risky," given the risk of reversal (Tr. 1830-31). That risk required not giving the answer. Even in state court, instructions on the legal effect of comparative-fault findings are improper when—*as here*—"the court is of the opinion that doubtful or unresolved questions of law or complex issues of law or fact are involved which may render such instruction or comment erroneous." Minn. R. Civ. P. 49.01(b).

*Second*, the answer violated this Court's direction in *Chicago* that juries are best directed not to concern themselves with the effect of their findings.

*Third*, the answer prejudicially and non-neutrally exceeded the question's scope by road-mapping precisely how the jury could make CRC liable for all damages. Instructively, this Court concluded in *Walther* that an instruction that a finding of concurrent negligence would make the defendant liable "'for the entire damage suffered'" was "unnecessary to the jury's function of specific fact-finding." *Walther v. Omaha Pub. Power Dist.*, 412 F.2d 1164, 1169-70 (8th Cir. 1969). And the district court in *Ramstad* declined to instruct on the effect of apportioning fault, to avoid contravening rule 49(a)'s purpose of "prevent[ing] the jury's view of the correct result from interfering with

factual findings." *Ramstad v. Lear Siegler Diversified Holdings Corp.*, 836 F. Supp. 1511, 1520 (D. Minn. 1993); *accord Dewitt v. Smith*, 152 F.R.D. 162, 164, 166-67 (W.D. Ark. 1993) (telling jury effect of apportionment would nullify verdict).

*Fourth*—related to that last point—the risk of the jury's view of the correct result interfering with its findings loomed large. Juror Question 2 followed Juror Question 1: "Can you define substantially certain for us?" App. 70, R.Doc. 276 at 1. JQ1 indicated that the jury was wrestling with the verdict question that required it to determine where Neumiller's mental state fell on the spectrum of negligence, recklessness, and substantial-certainty intent. *See* Add. 10, App. 76, R.Doc. 272 at 3; *see* App. 64-66, R.Doc. 274 at 25-26, 28-29 (intent and fault instructions). But the court told the jury the effect of *all* of its answers, *including* the Neumiller-intent question. That created the very sort of risk that rule 49(a) is intended to avoid: that the jury would truncate its wrestling and simply answer "Yes" to the Neumiller-intent question in an effort to require the corporate defendant to pay the entire damages award.

A new trial before a jury not given this answer is thus warranted.[24]

---

[24] McDougall did not request a new trial on punitive damages. The no-punitive-damages verdict is "now final." Add.24, App. 90, R.Doc. 339 at 9 n.1.

**V.** __Pre-Verdict Interest__**: The district court erroneously calculated pre-verdict interest based on $6,217,000 of the award, as McDougall did not prove that this sum was for anything other than future damages.**

This Court reviews whether the district court had authority to award prejudgment interest de novo as an issue of state law. *Adams*, 867 F.3d at 918.

Pre-verdict interest does not accrue on "awards for future damages." Minn. Stat. § 549.09, subd. 1(b)(2). Although pre-verdict interest generally accrues on past damages, it "is not available for judgments that encompass multiple types of damages—some of which are subject to interest under § 549.09 and some of which are not—when it is impossible to differentiate between the types of damages included in the judgment." *Adams*, 867 F.3d at 921; *see also Stinson v. Clark Equip. Co.*, 473 N.W.2d 333, 336 (Minn. App. 1991), *review denied* (Minn. Sept. 13, 1991); *Hagen v. State Bank of Cokato*, 1989 WL 12432, at *3 (Minn. Ct. App. Feb. 21, 1989), *review denied* (Minn. Apr. 24, 1989). That rule is consistent with the plaintiff having the burden to prove entitlement to pre-verdict interest, *Shardlow Townhomes Ass'n v. Midwest Fam. Mut. Ins. Co.*, 988 N.W.2d 502, 505 (Minn. App. 2023), because such interest "'is an element of damages,'" *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 918 (8th Cir. 2005) (quoting *Lienhard v. State,* 431 N.W.2d 861, 865 (Minn. 1988)).

The district court correctly did not award pre-verdict interest on $1,142,000 of the $7,750,000 award because, as McDougall acknowledged, it

was for future economic-loss damages, testified to by his damages expert. Add. 50, App. 116, R.Doc. 339 at 35. Nor does CRC dispute that, if the liability judgment were to stand, pre-verdict interest would accrue on $391,000, as the damages expert testified that it is for past economic losses. Tr. 853.

But the district court erred by concluding that pre-verdict interest accrues on the remaining $6,217,000 because only one of two things could be true, and in both scenarios pre-verdict interest does not accrue on this amount. Option 1: this amount was for "the losses to be suffered"—which are future damages—because those are the only other damages that McDougall requested. Tr. 1770-71. Option 2: determining whether the jury awarded this amount for past or future damages is impossible, in which case, pre-verdict interest does not accrue on this amount under *Adams*, *Hagen*, and *Stinson*, as McDougall did not meet his burden of proof.

Nor can this amount be for emotional distress. As the jury was instructed, it could not award for "Grief or emotional distress of the surviving spouse and the next of kin" or "For the pain and suffering of Cynthia McDougall before her death." App. 68, R.Doc. 274 at 33. Also, McDougall made clear to the jury that he was not requesting such damages. Tr. 1770-71 ("It's not grief. It's not emotional

distress, and it's not to punish anybody. It's for the losses to be suffered. Those are properly awarded right there on question 5 (indicating).").

The district court concluded that Minnesota law merely requires "exclud[ing] pre-verdict interest from awards when future damages are inextricable from other damages." Add. 51, App. 117, R.Doc. 339 at 36. But there is no basis on which to tease out any past damages from the $6,217,000.

The court concluded that pre-verdict interest has been "regularly . . . awarded on past general damage even when they were unascertainable." Add. 51 n.5, App. 117 n.5, R.Doc. 339 at 36 n.5. But the caselaw it cited dealt with a different issue: how damages no longer need to be readily ascertainable for pre-verdict interest to accrue. *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 869 (8th Cir. 2004); *Skifstrom v. City of Coon Rapids*, 524 N.W.2d 294, 296 (Minn. App. 1994), *followed in Myers v. Hearth Techs., Inc.*, 621 N.W.2d 787, 794 (Minn. App. 2001).

Therefore, if the denial of JMOL is not reversed, CRC respectfully asks the Court to reverse the award of pre-verdict interest and remand for the district court to re-calculate pre-verdict interest as accruing on no more than $391,000. Also, because the district court calculated *post*-verdict interest based on erroneous pre-verdict interest, CRC requests reversal of the post-verdict-interest award and remand for re-calculation of post-verdict interest.

## CONCLUSION

CRC respectfully requests reversal of the denial of JMOL because CRC is not liable for the consequences of Neumiller's deliberately huffing of CRC Duster while driving: the tragic death of Cynthia McDougall. Alternatively, CRC requests reversal and remand for a new trial due to instructional errors and the insufficiency of the evidence. If the liability judgment stands, CRC requests a reduction of its liability to 22.5%, *i.e.*, $1,743,750, because the jury found that CRC was only 22.5% at fault, and no joint-and-several-liability exception applies. CRC also requests a reversal of the pre-and-post-verdict interest award and remand for re-calculation because the court erroneously concluded that pre-verdict interest accrued on the $6,217,000 portion of the damages award.

Respectfully Submitted,

ARTHUR, CHAPMAN, KETTERING,
SMETAK & PIKALA, P.A.

Dated: March 6, 2025

s/Jeffrey M. Markowitz
Jeffrey M. Markowitz (#391959)
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214
P: (612) 339-3500
F: (612) 339-7655
jmmarkowitz@ArthurChapman.com

Robert J. Gilbertson (# 22361X)
David J. Wallace-Jackson (# 288767)
Virginia R. McCalmont (# 399496)
FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP
Capella Tower
225 South 6th Street, Suite 1500
Minneapolis, MN 55402
(612) 474-3300
bgilbertson@forsgrenfisher.com
dwallace-jackson@forsgrenfisher.com
vmccalmont@forsgrenfisher.com

**Attorneys for**
**Appellant CRC Industries, Inc.**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(B) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation because this brief contains **12,937** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P.32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Office 365 in 14-point Cambria font.

Pursuant to 8th Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

Respectfully Submitted,


Dated: March 6, 2025 　　　　　*s/Jeffrey M. Markowitz*
　　　　　　　　　　　　　　　Jeffrey M. Markowitz

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2025, following receipt of the March 4, 2025 deficiency notice regarding the March 4 Brief and Addendum, I caused the revised Brief of Appellant CRC Industries, Inc., and the revised Appellant's Addendum ("Addendum") to be submitted for filing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users were served by the CM/ECF system upon the Clerk's filing of the Addendum on March 5, 2025.

I further certify that on March 6, 2025, following receipt of the March 5, 2025 deficiency notice regarding the March 5 Revised Brief, I caused the Second Revised Brief of CRC to be submitted for filing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users were served by the CM/ECF system upon the Clerk's filing of Brief on March 6, 2025.

Within five days after the electronic version of this Brief has been approved for filing, ten (10) bound copies of the Brief and Addendum will be mailed by U.S. First Class Mail to the Clerk of Court for the United States Court of Appeals for the Eighth Circuit in St. Louis, Missouri and one (1) bound copy will be served on Appellee's counsel, also through U.S. First Class Mail.

I will include with those written materials three (3) paper copies of Appellant's Separate Appendix to be filed with the Clerk of Court and one (1) paper copy of Appellant's Separate Appendix, as service on Appellee's counsel.

Dated: March 6, 2025          *s/Jeffrey M. Markowitz*
                              Jeffrey M. Markowitz